

# Fourth Court of Appeals
## San Antonio, Texas

## CONCURRING AND DISSENTING OPINION

No. 04-17-00160-CV

**ROBERT B. JAMES, DDS, INC.**; Robert B. James, DDS, Individually; Jean James,
Individually; and Alexis Mei Pyles, Individually,
Appellants

v.

Cassandra J. **ELKINS**, DDS,
Appellee

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CI19860
Honorable Karen H. Pozza, Judge Presiding

Opinion by:    Irene Rios, Justice
Concurring and Dissenting Opinion by: Marialyn Barnard, Justice

Sitting:    Marialyn Barnard, Justice
            Luz Elena D. Chapa, Justice
            Irene Rios, Justice

Delivered and Filed:  May 30, 2018

I concur in the portions of the majority opinion and judgment reversing the trial court's

order and rendering judgment in favor of appellants Robert B. James, DDS, Inc., A Texas

Corporation, Robert B. James, DDS, Individually, Jean James, Individually,[1] and Alexis Mei

Pyles, Individually.  However, because I believe the trial court erred in refusing to grant, in their

entirety, the motions to dismiss filed by appellants, I respectfully dissent to the portions of the

---

[1] For the remainder of the opinion, any reference to "James" refers collectively to appellants Robert B. James, DDS,
Inc., A Texas Corporation, Robert B. James, DDS, Individually, Jean James, Individually.  When these appellants are
referenced individually, I refer to them as "the practice," "Dr. James," and "Jean."

majority opinion and judgment affirming the trial court's order. I would reverse the trial court's order of dismissal in its entirety, render judgment dismissing the claims for defamation, business disparagement, intentional infliction of emotional distress, and conspiracy against all appellants, and remand the matter for a determination of attorneys' fees and costs.

## BACKGROUND

Dr. James operated a pediatric dental practice in San Antonio, Texas. In 1991, he hired Dr. Elkins, a licensed pediatric dentist, to work in his practice. The parties agree they signed a written contract ("the Contract"). Dr. Elkins alleges the terms of her employment required that, among other things, she be paid a percentage of her gross production. This allegation is disputed by Dr. James and the other appellants, who contend she was to be paid a percentage of her net production, i.e., a percentage of collections. To collect payment, Dr. Elkins would submit a commission-payment request based on her production. To allow her to submit the information, Dr. Elkins had access to the practice's receivables. After calculating her percentage of production, and subtracting expenses and prior payments, Dr. Elkins would submit her commission statement to the practice's payroll provider. Dr. James would then sign her paycheck.

It is undisputed that over the course of Dr. Elkins's employment, Dr. James increased her managerial responsibilities with the hope that Dr. Elkins would ultimately purchase the practice when he retired. In 2014, they began discussing that prospect. However, because there was a disagreement over the valuation of the practice, in November 2014, Dr. Elkins declined the proffered purchase. According to Dr. James, he then decided to market the practice to other potential purchasers. To that end, according to Dr. James, he asked his wife Jean James to begin organizing the practice's business records in order to market it for sale. Jean claimed that when she began reviewing the books and records, she discovered Dr. Elkins had submitted and received

payments based on gross production and had charged write-offs against Dr. James's production as opposed to her own. Jean brought these issues to Dr. James's attention.

Dr. James claimed that thereafter, he instructed Jean and an administrator for the practice, Alexis Mei Pyles, to investigate Dr. Elkins's activities with regard to the practice's finances. However, Dr. Elkins alleged the purpose of the investigation was retaliatory and based on her refusal to purchase the practice. She claimed the goal of the investigation was to permit the practice to submit an insurance claim for employee theft to the practice's insurance carrier, Travelers Casualty Insurance Company of America, in hopes of procuring a payment "in excess of $500,000.00."

According to Jean and Pyles, they reviewed practice financial documents for a three-year period — from 2011 through 2014, and interviewed current and former employees as well as other relevant witnesses. They claimed their investigation showed Dr. Elkins had been overpaid by more than $300,000.00 during the 2011–2014 period because, among other financial misconduct, she had submitted payment requests based on a percentage of gross production as opposed to the contractually mandated net production.[2] At Dr. James's behest, Pyles prepared a report summarizing the findings made by Pyles and Jean during their investigation. This report was entitled "Fraud Examination Report" ("FRE").

Dr. James claimed that as a result of the investigative findings, he terminated Dr. Elkins in January 2015. The practice submitted a claim to Travelers, which included a copy of the FRE. Travelers paid the practice $25,000.00 — policy limits. In addition, Dr. James authorized Jean

---

[2] In the report, Pyles stated that not only had Dr. Elkins committed payroll fraud for a minimum of three years in the sum of more than $300,000.00, she had also: (1) breached her confidentiality agreement with the practice by making unauthorized copies of documents, removing financial information, and discussing practice information with individuals outside of the practice; (2) attempted to lure a practice dentist and other practice employees away from the practice; (3) committed theft of petty cash of at least $18,000.00; (4) removed practice documents from the building: (5) tampered with and changed a password to a practice video camera; and (6) added her name to Dr. James's personal credit card without his permission and purchased items with the card that were not for the practice.

and Pyles to contact the San Antonio Police Department ("SAPD") about the alleged financial improprieties; Dr. Elkins claimed "upon information and belief" that Travelers required the matter be reported to law enforcement.  SAPD prepared a police report.  Dr. James, Jean, and Pyles provided written statements to SAPD.  The record also shows Jean spoke with representatives from the Bexar County District Attorney's Office, urging that Dr. Elkins be prosecuted.  Ultimately, Dr. Elkins was indicted in November 2016 for two counts of misapplication of fiduciary property.

In January 2017, and as is relevant to this appeal, Dr. Elkins sued the practice, Dr. James, Jean, and Pyles for defamation, business disparagement, intentional infliction of emotional distress ("IIED"), and conspiracy.[3]  Dr. Elkins's claims were based on statements made in the FRE report and to SAPD and Travelers regarding Dr. Elkins's alleged malfeasance.  In total, Dr. Elkins sought compensatory damages of more than $11,000,000.00 and punitive damages of almost $35,000,000.00.  In response to the lawsuit, Dr. James, Jean, and the practice filed a partial motion to dismiss pursuant to section 27.003 of the TCPA in which they sought dismissal of Dr. Elkins's claims for defamation, business disparagement, and intentional infliction of emotional distress. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a) (West 2015).  Pyles filed a separate motion to dismiss under the TCPA.  *See id.*  She too sought to dismiss the claims for defamation, business disparagement, IIED, as well as conspiracy — the only claims lodged against her.  In both motions, the parties alleged Dr. Elkins's claims should be dismissed because they fell within the TCPA, and Dr. Elkins had failed to produce clear and specific evidence on the elements of her claims.

After Dr. Elkins filed a response to the motions, the trial court held a hearing.  Thereafter, the trial court denied both motions to dismiss.  James and Pyles asked the trial court to reconsider

---

[3] Dr. Elkins also asserted claims for breach of contract against the practice, and negligent misrepresentation against the practice and Dr. James.  She also brought suit against Travelers and the investigative firm it hired to investigate the claim, alleging negligence, negligent misrepresentation, breach of contract, and violations of the Texas Deceptive Trade Practices Act and the Texas Insurance Code.

based on newly discovered evidence — specifically the previously misplaced employment contract between the practice and Dr. Elkins. According to the movants, the Contract was discovered when the dentist who ultimately purchased the practice in May 2015 was cleaning out items left behind by Dr. James. In response, Dr. Elkins alleged the contract was a forgery. The trial court denied the motion to reconsider. James perfected an appeal, as did Pyles. *See id.* § 51.014(a)(12) (West Supp. 2017) (permitting interlocutory appeals from orders denying motions to dismiss filed under the TCPA).

**ANALYSIS**

On appeal, James and Pyles contend the trial court erred in denying their motions to dismiss. They argue the trial court should have granted their motions because: (1) the claims asserted by Dr. Elkins fall within the TCPA; and (2) Dr. Elkins failed to produce clear and specific evidence establishing a prima facie case on the elements of her claims. James and Elkins also argue that if this court reverses the trial court's order, it must remand the matter to the trial court for an award of attorneys' fees and costs. In addition, in her brief, Dr. Elkins raises issues challenging the trial court's denial of her motion for discovery and motion for continuance in the event. She contends that if the court reverses the trial court's order, it should address these issues.

***Motion to Dismiss Under the TCPA***

1. *Applicable Law*

The stated purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect rights of a person to file meritorious lawsuits for demonstrable injury. *Id.* § 27.002. The TCPA was meant to "protect citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public

concern." *In re Lipsky*, 460 S.W.3d 579, 584, 586 (Tex. 2015) (orig. proceeding) (citing House

Comm. On Judiciary & Civil Jurisprudence, Bill Analysis, Tex. HB 2973, 82nd Leg., R.S. (2011)).

To that end, the TCPA provides for the expedited dismissal of a legal action that implicates a

defendant's First Amendment rights, including the right of free speech, the right to petition, and

the right of association, when the plaintiff cannot establish a prima facie case on her claims. *Id.* at

586; *Avery v. Baddour*, No. 04-16-00184-CV, 2016 WL 4208115, at *2 (Tex. App.—San Antonio

Aug. 10, 2016, pet. denied); *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(a), 27.005(b), (c).

The Legislature created a burden-shifting mechanism within the statute to expedite the dismissal

of claims covered therein. *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017)

(citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.003; *Lipsky*, 460 S.W.3d at 586).  The filing of a

motion to dismiss by "a defendant who believes that the lawsuit responds to the defendant's valid

exercise of First Amendment rights" triggers this mechanism. *Lipsky*, 460 S.W.3d at 586.

The first step of the mechanism requires the movants to show by a preponderance of the

evidence that the plaintiff's claims are based on, relate to, or are in response to the exercise of the

movants' right to free speech, right to petition, or right of association. TEX. CIV. PRAC. & REM.

CODE ANN. § 27.005(b); *Coleman*, 512 S.W.3d at 898; *Lipsky*, 460 S.W.3d at 586.  The TCPA

defines "exercise of the right of free speech" as "a communication[4] made in connection with a

matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). A "matter of public

concern" includes issues related to: (a) health or safety; (b) environmental, economic, or

community well-being; (c) the government; (d) a public official or public figure; or (e) a good,

product, or service in the market place. *Id.* § 27.001(7).  The "exercise of the right to petition"

means communications relating to an array of judicial, administrative, and other governmental

---

[4] A "communication" is defined as the making or submitting of a statement or document in any form — oral, visual, written, audiovisual, or electronic.  TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1).

proceedings. *Lipsky*, 460 S.W.3d at 586–87 n.5; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4). The "exercise of the right of association" refers to a communication between those "who join together to collectively express, promote, pursue, or defend common interests." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2).

If the movants are able to demonstrate the plaintiff's claims implicate one or more of the stated First Amendment rights, the burden shifts to the plaintiff — the party who brought the action — to establish "by clear and specific evidence a prima facie case for each essential element of" each claim in question. *Id.* at § 27.005(c); *see Lipsky*, 460 S.W.3d at 587; *Coleman*, 512 S.W.3d at 899. If the plaintiff is unable to meet this burden, the trial court must dismiss her claims. *Lipsky*, 460 S.W.3d at 587. If the plaintiff is able to establish a prima facie case for each essential element of her claims, the burden then shifts back to the movants to prove by a preponderance of the evidence each essential element of a valid defense to the plaintiff's claims. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d); *see Coleman*, 512 S.W.3d at 899.

## 2. *Standard and Scope of Review*

Courts conduct a de novo review of a trial court's denial of a TCPA motion to dismiss. *Avery*, 2016 WL 4208115, at *2; *Reyna v. Baldridge*, No. 04-14-00740-CV, 2015 WL 4273265, at *2 (Tex. App.—San Antonio July 15, 2015, no pet.) (mem. op.). In other words, courts review de novo whether the parties met their respective burdens under the TCPA. *Tervita, LLC v. Sutterfield*, 482 S.W.3d 280, 282 (Tex. App.—Dallas 2015, pet. denied); *Reyna*, 2015 WL 4273265, at *2; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b), (c), (d). In making this determination, a court must "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a); *Lipsky*, 460 S.W.3d at 587.

With regard to the plaintiff's burden to establish "by clear and specific evidence a prima facie case" for the essential elements of her claims, the TCPA defines neither "prima facie case" nor "clear and specific evidence." However, unlike "clear and specific evidence," a "prima facie case has a traditional legal meaning." *Lipsky*, 460 S.W.3d at 590. It refers to the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (per curiam)). As for "clear and specific evidence," the supreme court has now held that it requires more than mere notice pleading, but "does not impose an elevated evidentiary standard or categorically reject circumstantial evidence," i.e., it does not impose a higher burden than that required at trial. *Id.* at 590–91.

### 3. *Did James and Pyles Prove the TCPA Applies?*

As set out above, James and Pyles, as movants, were required to establish by a preponderance of the evidence that Dr. Elkins's claims are based on, relate to, or are in response to the exercise of their right to free speech, right to petition, or right of association. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(a), 27.005(b); *Coleman*, 512 S.W.3d at 898; *Lipsky*, 460 S.W.3d at 586. I contend both James and Pyles met this burden, establishing the statements relied upon by Dr. Elkins for her defamation, business disparagement, and other claims fall within the TCPA.

James and Pyles asserted that all of Dr. Elkins's claims challenged in their respective motions to dismiss relate to their exercise of their First Amendment rights to free speech, i.e., their communications were made in connection with a matter of public concern. TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001(3). More specifically, they asserted, and argue on appeal, the statements in the FRE report and to SAPD and Travelers about Dr. Elkins's alleged theft and

misapplication of practice property were related to community well-being and the government. *Id.* § 27.001(7)(B), (C).[5]

The Texas Supreme Court has addressed what constitutes a matter of public concern. *See Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017). According to the court, speech is a matter of public concern when the statements at issue can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Matters of public concern include, among other things, commission of crime. *Id.* Thus, statements made for the purpose of reporting the commission of criminal offenses are related to community well-being or the government. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a), 27.005(b); *Coleman*, 512 S.W.3d at 898; *Lipsky*, 460 S.W.3d at 586. The same is true when the report concerns acts that might subject the perpetrator to civil liability. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003(a), 27.005(b); *Coleman*, 512 S.W.3d at 898; *Lipsky*, 460 S.W.3d at 586. The gravamen of Dr. Elkins's claims are that James and Pyles made false statements to SAPD and Travelers that subjected her to criminal liability — and could subject her to civil liability. Reports that an individual has committed acts that might subject them to criminal or civil liability are issues relating to both community well-being and the government, particularly given that in *Coleman*, the supreme court held the TCPA does not require that the statements that form the basis of a plaintiff's claims specifically mention the public concern at issue, nor does it require more than a "tangential relationship" to the specific public concern. 512 S.W.3d at 900. The holding in *Coleman* suggests the TCPA's definition of exercise of free speech — as well as

---

[5] The majority contends James only sought dismissal of Elkins's claims as they related to the statements to SAPD. I believe the motion includes Elkins's claims based on the report to Travelers. For example, in the motion, James states the "investigative findings" were relayed not only to law enforcement authorities, but to Travelers. The motion references the insurance claim submitted to Travelers and its conclusion that a covered loss had occurred. In addition, the motion states the conduct complained of by Elkins "is the report to SAPD, discussions with state prosecutors, *and the filing of an insurance claim*." Thus, James recognized Elkins's claims were based on both the report to SAPD and the FRE and sought relief under the TCPA based on both.

exercise of petition and association — extend beyond the parameters of expression protected by the First Amendment. *See id.* Thus, a court must not read the TCPA's definitions of "exercise of the right of free speech" and "matter of public concern" more narrowly than the ordinary meaning of the words as set forth in the statute. *See id.*

The statements made by James and Pyles were communications under the TCPA because they were oral or written. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1). The statements fall within the "exercise of the right of free speech" as a "matter of public concern" because they involved Dr. Elkins's alleged commission of numerous acts that could subject her to either criminal or civil liability, which are issues "in connection with" and "related to" community well-being and government. *See id.* §§ 27.001(3), 27.001(7)(B), (C); *see also Watson v. Hardman*, 497 S.W.3d 601, 607 (Tex. App.—Dallas 2016, no pet.) (recognizing that statements regarding misconduct or crime are statements relating to "community well-being"). Therefore, I believe James and Pyles successfully established the TCPA's applicability to Dr. Elkins's claims under the free-speech prong of the statute.[6] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001(3), 27.003(a).

Neither below nor in this court does Dr. Elkins respond to the arguments of James and Pyles with regard to the applicability of the TCPA as it relates to the exercise of the right to free speech, right to petition, and right to associate. Rather, as the majority asserts, Dr. Elkins argues her claims are specifically exempt from the statute under the TCPA's insurance exemption provision. *See id.* § 27.010(d). That section states the TCPA "does not apply to a legal action

---

[6] James and Pyles alternatively argue the statements relied upon by Dr. Elkins in support of her claims are likewise subject to the TCPA based on the exercise of the right to petition and right to association. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2), (4). Because I believe the communications were made in the exercise of the right of free speech, these contentions need not be addressed. *See Coleman*, 512 S.W.3d at 901–02; *but see Ford v. Bland*, No. 14-15-00828-CV, 2016 WL 7323309, at *1 (Tex. App.—Houston [14th Dist.] Dec. 15, 2016, no pet.) (holding statements to police regarding incidences of perceived wrongdoing are exercise of right to petition under TCPA); *Tervita, LLC*, 482 S.W.3d at 287 (suggesting claims based on communications between insured and insurer regarding claim would fall within TCPA right to associate).

brought under the Insurance Code or arising out of an insurance contract." *Id.* The burden is on Dr. Elkins to prove this statutory exemption. *See Tervita, LLC*, 482 S.W.3d at 282.

Dr. Elkins argues the exemption is applicable because James and Pyles made statements to Travelers — the practice's insurance carrier — when the practice sought recovery under its policy for Dr. Elkins's alleged misappropriation of property. She also points out that she sued Travelers for violations of the Texas Insurance Code. Dr. Elkins therefore concludes her legal action was brought under the Insurance Code or arose out of an insurance contract, exempting her claims from the TCPA.

Contrary to the majority, I believe this issue was resolved by the Dallas Court of Appeals in *Tervita, LLC v. Sutterfield*. In that case, an injured employee filed a claim for worker's compensation benefits, but his claim was denied. *Id.* at 281–82. At a contested case hearing before the Texas Department of Insurance, a Tervita representative testified. *Id.* at 282. The Department ruled in Tervita's favor. *Id.* Thereafter, the employee sued Tervita for an alleged violation of the Texas Labor Code, negligent misrepresentation, and conspiracy. *Id.* Tervita filed a motion to dismiss pursuant to section 27.003(b) of the TCPA, but it was denied by the trial court. *Id.*

On appeal, the Dallas Court of Appeals held Tervita proved the employee's claims were based on Tervita's exercise of a protected right under the TCPA. *Id.* at 284–85. However, relying on section 27.010(d), the employee argued his claims against Tervita were exempt from the TCPA because the statute does not apply to claims under the Insurance Code or that arise out of an insurance contract. *Id.* According to the employee, he could not have filed suit under the Labor Code but for the fact that Tervita had elected to obtain worker's compensation insurance. *Id.* Therefore, according to the employee, his claims arose out of an insurance contract between his employer and the insurance carrier. *Id.* The appellate court rejected this argument. *Id.* at 285–86.

The Dallas Court of Appeals held the employee's suit was neither a legal action brought under the Insurance Code, nor did it arise out of an insurance contract. *Id.* After reviewing the employee's petition, the court held it showed claims against Tervita under the Labor Code, which prohibits the discharge or discrimination against a worker who files a worker's compensation claim or institutes a proceeding under the Texas Worker's Compensation Act, and under the common law for conspiracy. *Id.* at 286. The petition did not include a claim against Tervita under the Insurance Code, and the employee did not seek to recover damages from Tervita based on the contract between it and the carrier. *Id.* Accordingly, the employee's suit did not fall within the insurance exemption set out in section 27.010(d). *Id.* I find *Tervita* persuasive.

I believe Dr. Elkins's argument with regard to section 27.010(d) is essentially the same as that urged by the employee in *Tervita*, and rejected by the appellate court. I have reviewed Dr. Elkins's petition and she did not assert claims against James or Pyles *under* the Texas Insurance Code, nor does she seek recovery from them *based* on the insurance contract between the practice and Travelers. Rather, the only claims asserted against James or Pyles arise under common law — defamation, business disparagement, intentional infliction of emotional distress, and conspiracy. Thus, her claims against James and Pyles — the only movants under the TCPA — were not brought under the Insurance Code, nor do they arise out of an insurance contract. *See id.* at 285–86. I would hold that just as the employee's claims in *Tervita* were not subject to the insurance exemption in section 27.010(d), neither are Dr. Elkins's claims. *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(d).

In sum, I would hold that if the trial court denied the motions to dismiss because it determined Dr. Elkins's claims were not subject to the TCPA, such decision was erroneous. Because I believe James and Pyles established the applicability of the TCPA, the burden shifted

to Dr. Elkins to establish "by clear and specific evidence a prima facie case" for the essential elements of the claims challenged in the motions to dismiss — defamation, business disparagement, IIED, and conspiracy. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 587; *Coleman*, 512 S.W.3d at 899. I do not believe she met her burden with regard to any of her claims.

4. *Did Dr. Elkins Establish a Prima Facie Case?*

James and Pyles argue Dr. Elkins did not establish each element of her claims by clear and specific evidence. As discussed previously, establishing a prima facie case by clear and specific evidence requires more than mere notice pleading. *Lipsky*, 460 S.W.3d 590–91. Direct evidence is not required; rather, circumstantial evidence and rational inferences may be sufficient to meet the plaintiff's burden. *Id.* at 489–90. However, conclusory statements are not probative, and "bare, baseless opinions" are not "a sufficient substitute for clear and specific evidence. *Id.* at 492; *Quintanilla v. West*, 534 S.W.3d 34, 47 (Tex. App.—San Antonio 2017, pet. filed) (quoting *E.I. DuPont*, 136 S.W.3d at 223–24).

   a. Defamation

To establish a claim for defamation, a plaintiff must prove the defendant (1) published a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *Lipsky*, 460 S.W.3d at 593 (citing *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). The plaintiff's status determines the degree of fault the plaintiff must prove — a private person need only prove negligence, but a public figure or official must prove actual malice. *Id.* However, even a private person must prove actual malice when her claims raise a qualified privilege. *Espinosa v. Aaron's Rents, Inc.*, 484 S.W.3d 533, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see Shell Oil Co. v. Writt*, 464

S.W.3d 650, 655 (Tex. 2015); *Gonzales v. Levy Strauss & Co.*, 70 S.W.3d 278, 282 (Tex. App.—San Antonio 2002, no pet.). "'Actual malice'" in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth." *Id.* (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000)). It does not mean bad motive or ill will; rather, it simply means the defendant entertained serious doubts about the truth of the publication. *See Greer v. Abraham*, 489 S.W.3d 440, 443 (Tex. 2016); *Hotz v. Miller*, 361 S.W.3d 707, 713 (Tex. App.—Tyler 2012, pet. denied).

James and Pyles argue they are entitled to a qualified privilege in this case, mandating that Dr. Elkins prove the allegedly defamatory statements were made with actual malice as opposed to negligence. They assert Dr. Elkins failed to meet her burden to produce clear and specific evidence with regard to this element. James and Pyles contend their internal communications, as well as those to SAPD and Travelers were subject to a qualified or conditional privilege because they were made in the course of an investigation following a report of wrongdoing by Dr. Elkins. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 647 (Tex. 1995); *Espinosa*, 484 S.W.3d at 543; *Gonzales*, 70 S.W.3d at 282. Whether a qualified privilege exists is a question of law. *Burbage v. Burbage*, 447 S.W.3d 249, (Tex. 2014); *Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 664 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

A qualified privilege attaches to statements made in the course of an investigation following a report of employee wrongdoing. *Randall's Food Mkts.*, 891 S.W.2d at 646; *Espinosa*, 484 S.W.3d at 543; *Gonzales*, 70 S.W.3d at 282. "The privilege remains intact as long as communications pass only to persons having an interest or duty in the matter to which the communications relate." *Randall's Food Mkts.*, 891 S.W.2d at 646. The privilege is defeated only

by proof the statements at issue were motivated by actual malice that existed at the time the statements were made. *Id.*

Both James and Pyles pled the existence of a qualified privilege. Pursuant to the TCPA, the burden to establish a valid defense to a claim rests upon the movant. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d). To the extent a qualified privilege is an affirmative defense under the TCPA, and assuming James and Pyles were required to prove their investigation privilege by a preponderance of the evidence before Dr. Elkins was required to prove actual malice, I believe James and Pyles met their burden. *See id.* at §§ 27.005(c), (d); *see also Burbage*, 447 S.W.3d at 254 (holding that qualified privilege operates as affirmative defense in nature of confession and avoidance, and defendant bears burden of proving privilege unless plaintiff's petition affirmatively demonstrates privilege; if proven or demonstrated, burden shifts to plaintiff to prove actual malice).

The undisputed evidence shows Jean and Pyles conducted an investigation into Dr. Elkins's conduct — financial and otherwise — at Dr. James's behest after Jean had reported her belief that Dr. Elkins had submitted improper payroll requests, i.e., payroll requests made based on gross as opposed to net production, and inaccurate write-offs. Dr. Elkins contended the investigation was, at best, a shoddy pretext, including only four years of her employment — 2011 through 2014 — and was merely a ruse to retaliate against her when she declined to purchase the practice. However, she does not dispute that an investigation was conducted. At the conclusion of the investigation, believing they had uncovered proof of financial malfeasance and other improprieties, reports and statements about the alleged malfeasance were submitted to SAPD and Travelers. It is these statements upon which Dr. Elkins bases her claims.

Dr. Elkins argues the privilege does not apply because by the time the statements were made to SAPD and Travelers, the investigation had been completed. Dr. Elkins fails to understand the scope of the privilege. The supreme court specifically held the investigation privilege remains intact as long as the statements that are alleged to be defamatory pass to those with a duty or interest in the matter to which the statements relate. *Randall's Food Mkts.*, 891 S.W.2d at 646. Here, the statements were passed to SAPD, which obviously had a duty to investigate claims of criminal conduct, and Travelers, which undoubtedly had an interest in the matter given that the practice sought to recover under its policy with Travelers based on Dr. Elkins's alleged misconduct. Because the statements upon which Dr. Elkins relied for her claims were passed only to those with a duty or interest in her alleged wrongdoing, the investigative privilege remained intact for purposes of the reports and statements to SAPD and Travelers. *See id.* This court has recognized that statements made to an interested or duty-bound entity following the conclusion of an investigation are still subject to the privilege. *See Gonzales*, 70 S.W.3d at 282.

In *Gonzales*, the plaintiffs sued their employer for violations of the Texas Right to Work Act and defamation after the employer fired them for poor judgment and violation of company rules. *Id.* at 280–81. The plaintiffs alleged their employer defamed them in connection with their termination. *Id.* The employer claimed it was entitled to judgment on the defamation claim because any allegedly defamatory statements were privileged because they were made as part of an investigation into the employees' wrongdoing, and there was no evidence of actual malice. *Id.* at 281–82. The trial court granted summary judgment in favor of the employer, and the employees appealed. *Id.* at 281.

With regard to the defamation claim, we began our analysis in *Gonzales* by reciting the law regarding the qualified privilege relating to investigative statements as set forth in *Randall's*

*Food Mkts. Id.* at 282. Therein, we noted the statements relied upon by the employees for the defamation claim were made to a company supervisor, human resources director, regional director, *as well as the Texas Workforce Commission and the Frick Company, which handled the unemployment claim on the company's behalf. Id.* (emphasis added). We held that because the allegedly defamatory statements "were made only to those involved in the process of investigating the incident and [the] unemployment claims," the statements were qualifiedly privileged. *Id.* And because the employees failed to raise a fact issue on actual malice, summary judgment in favor of the employer was proper. *Id.* at 283.

*Gonzales* demonstrates allegedly defamatory statements are qualifiedly privileged to all of those involved in investigating the incident based either on a duty — the Texas Workforce Commission — or common interest — the company handling the unemployment claims for the employer. *See id.* at 281–83. The privilege is not limited to statements made during an employer's actual investigation, but extends to the reporting of the investigative results to those who have a duty or interest therein. *See id.* Thus, I would hold the statements made by James and Pyles to SAPD and Travelers were subject to a qualified privilege as both had an interest or duty in Dr. Elkins's alleged misconduct. *See id.* Because I believe James and Pyles proved their defense of qualified privilege by a preponderance of the evidence, Dr. Elkins had to establish a prima face case by clear and specific evidence with regard to the element of actual malice. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c), (d).

In support of actual malice, Dr. Elkins asserted in her pleadings and affidavit that the investigation conducted by Jean and Pyles was shoddy and incomplete. She claimed that if they had reviewed the financial documents applicable to her entire tenure with the practice — or asked her, they would have discovered she frequently submitted paperwork for payment based on gross

as opposed to net production. In support, she provided documents establishing she submitted paperwork seeking payment based on gross production throughout her tenure with the practice, and that she was paid based on those submissions. Thus, according to Dr. Elkins, if Jean and Pyles had reviewed more than three years of documents, they would have discovered she had always been paid based on gross production, and because they did not, their statements were made with reckless disregard for the truth, i.e., actual malice. She also points out they had a motive to conduct a negligent investigation — retaliation for her refusal to purchase the practice at the price desired by Dr. James.

However, actual malice does not focus on what the defendant should have done or failed to do. *Tex. Campaign for the Env't v. Partners Dewatering Int'l, LLC*, 485 S.W.3d 184, 201 (Tex. App.—Corpus Christi 2016, no pet.). Neither is the focus on what a defendant would have known or discovered if he had researched the matter. *Id.* Rather, the focus is on whether the defendant subjectively entertained significant doubt about the truth of his statements when they were made. *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002). Neither an error in judgment nor negligence is insufficient to establish reckless disregard. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003); *Casso v. Brand*, 776 S.W.2d 551, 563 (Tex. 1989).

Moreover, Texas courts have recognized that "a failure to fully investigate is not evidence of actual malice." *E.g.*, *Hearst Corp. v. Skeen*, 159 S.W.3d 633 (Tex. 2005) (quoting *Bentley*, 94 S.W.3d at 596). Lack of care or injurious motive alone are not proof of actual malice. *Bentley*, 94 S.W.3d at 596. Moreover, misunderstanding ambiguous facts is not actual malice, although improbable statements made on obviously dubious information may be. *Id.*

In this case, for proof of malice, Dr. Elkins relies on the allegedly incomplete investigation and the alleged motive of retaliation. This is insufficient to establish actual malice. The financial

records for 2011–2014 — the records relied on by James and Pyles — showed payments to Dr. Elkins based on gross production. The Contract defined "production" as the fee charged for the service by the practice. Per the terms of the Ccontract, Dr. Elkins was to be paid "production at a reduced rate" for any procedures she did that were subject to a "reduced rate for whatever reason." James and Pyles certainly could have interpreted this to mean net production. Dr. Elkins claimed her signature on the Contract produced by James and Pyles was a forgery, but she did not produce any evidence James and Pyles knew or should have known it was a forgery. Thus, the information relied on by James and Pyles was not "obviously dubious." *See Bentley*, 94 S.W.3d at 596.

Dr. Elkins's claim of an inadequate investigation is no evidence of malice. Dr. Elkins provided no evidence that James or Pyles purposefully avoided the truth during the investigation. It is undisputed they reviewed four years of financial documents and interviewed numerous witnesses inside and outside the practice. Dr. James advised both Jean and Pyles when they came to him that Dr. Elkins was to be paid based on net production, and Jean and Pyles relied on that statement. Even if Dr. James's statement was false, there is no evidence the aged dentist knew it was false — and the Contract belies this, and there was no reason for Jean and Pyles not to rely on his statement. *See DR Partners v. Floyd*, 228 S.W.3d 493, 498 (Tex. App.—Texarkana 2007, pet. denied) (holding actual malice cannot be inferred from falsity of statement alone).

The numerous documents Dr. Elkins relies on show she was paid for certain periods based on gross as opposed to net production (she did not include documents for every pay period during her tenure), but this does not constitute evidence of purposeful avoidance. Rather, the documentation merely establishes that for many pay periods Dr. Elkins was paid based on gross production, not that she was *entitled* to payment on that basis. The other evidence she relies on are her conclusory statements that she had been paid based on gross production, but conclusory

statements are not probative, and "bare, baseless opinions" are not "a sufficient substitute for clear and specific evidence." *Lipsky*, 460 S.W.3d at 492; *Quintanilla*, 534 S.W.3d at 47. In sum, Dr. Elkins failed to establish "by clear and specific evidence a prima facie case for [the] essential element of" actual malice. *See id.* at § 27.005(c); *Lipsky*, 460 S.W.3d at 587; *Coleman*, 512 S.W.3d at 899. Accordingly, I believe the trial court erred in refusing to dismiss Dr. Elkins's defamation claims against James and Pyles.

    b. *Business Disparagement*

James and Pyles next contend Dr. Elkin's failed to produce clear and specific evidence on certain elements of Dr. Elkins's business disparagement claim. To prevail on a business disparagement claim, a plaintiff must establish (1) the defendant published false and disparaging information about the business (2) with actual malice, (3) without privilege, (4) that resulted in special damages. *Lipsky*, 460 S.W.3d at 592. James and Pyles argue Dr. Elkin's failed to meet her burden with regard to the elements of actual malice and privilege.[7]

As noted above, I believe Dr. Elkins failed to establish by clear and specific evidence a prima facie case on the element of actual malice with regard to her defamation claim. It naturally follows that her proof is likewise deficient with regard to the business disparagement claim. *See Forbes Inc.*, 124 S.W.3d at 171.

Moreover, contrary to the burden in her defamation claim, it was Dr. Elkins's burden to establish an absence of privilege to avoid dismissal of her business disparagement claim. *See Lipsky*, 460 S.W.3d at 592. James and Pyles proved their investigative privilege by a

---

[7] A business disparagement claim is similar to a defamation claim. *Forbes Inc.*, 124 S.W.3d at 170. They differ in that defamation protects the personal reputation of a person, whereas business disparagement protects economic interest. *Id.* The actual malice standard for both torts is that same, i.e., the plaintiff must establish the defendant made the statement or statements at issue "with knowledge that it was false or with reckless disregard of whether it was true or not." *Id.* at 171.

preponderance of the evidence. Dr. Elkins has not established the absence of the privilege given her only argument was that at the time the statements were made, the investigation had concluded. *See Gonzales*, 70 S.W.3d at 281–83.

In my opinion, Dr. Elkins failed to establish by clear and specific evidence a prima facie case on the elements of actual malice and absence of privilege with regard to her claim for business disparagement. I would therefore hold the trial court erred in denying the motions to dismiss Dr. Elkins's claims for business disparagement as to James and Pyles.

c.  Intentional Infliction of Emotional Distress

James and Pyles first argue the trial court erred in refusing to dismiss Dr. Elkins's claim for IIED because IIED is a "gap-filler" cause of action that is unavailable because the gravamen of Dr. Elkins's complaint in this case sounds in defamation. In other words, they argue that because her IIED claim is based on the same conduct as her defamation claim — and it undeniably is — her IIED claim fails as a matter of law. I disagree.

This court addressed this same argument in *Spencer v. Overpeck*, No. 04-16-00565-CV, 2017 WL 993093, at *4–*5 (Tex. App.—San Antonio Mar. 15, 2017, pet. denied) (mem. op.). In *Spencer*, we held the "gap-filler" argument was premature in the context of an appeal from the denial of a motion to dismiss under the TCPA. *Id.* at *4; *but see Bilbrey v. Williams*, No. 02-13-00332-CV, 2015 WL 1120921, at *13–*14 (Tex. App.—Fort Worth, Mar. 12, 2015, no pet.) (mem. op.) (holding that because IIED is "gap-filler" claim and factual basis for plaintiff's IIED was same as factual basis for defamation claim, plaintiff had not provided "minimum quantum of evidence necessary to support" IIED claim). In reaching this holding, we relied on the supreme court's opinion in *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438 (Tex. 2004). In that case, the supreme court recognized the "gap-filler" argument does not mean a plaintiff could not

establish a prima facie case; only that the claim would be otherwise precluded in light of duplicate remedies available in other claims. *Id.* at 447–48. Thus, because a plaintiff's burden under section 27.005(c) is merely to establish a prima facie case for each element of her claims, any suggestion that a plaintiff's claim fails because it is merely a "gap-filler" is premature. *Spencer*, 2017 WL 993093, at *4–*5; *but see Bilbrey*, 2015 WL 1120921, at *13–*14. Accordingly, the "gap-filler" argument does not require that this court reverse the trial court's denial of the motions to dismiss with regard to Dr. Elkins's claim for IIED.

The "gap-filler" argument is not the only argument presented by James and Pyles with regard to the IIED claim. They also contend, among other things, that Dr. Elkins failed to establish "by clear and specific evidence a prima facie case for each essential element of" her IIED claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *see Lipsky*, 460 S.W.3d at 587; *Coleman*, 512 S.W.3d at 899. Specifically, they argue she failed to produce clear and specific evidence of extreme and outrageous conduct. On this record, I agree.

"To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffman-LaRoche Inc.*, 144 S.W.3d at 445 (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998)); *see Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 17 n.3 (Tex. 2008). The supreme court has defined extreme and outrageous conduct as conduct that is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Hoffman-LaRoche Inc.*, 144 S.W.3d at 445 (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting RESTATEMENT (SECOND) OF

TORTS § 46 cmt. d. (1965)). Liability for the tort of IIED does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id.* (citing *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex. 1999); RESTATEMENT (SECOND) OF TORTS § 46 cmt. d.).

In Dr. Elkins's petition, as well as her response to the motions to dismiss, she relied on the allegedly false statements made by James and Pyles as evidence of extreme and outrageous conduct. In her petition she specifically stated that "by making the false statements [described in the petition][James and Pyles] caused her emotional distress." She further stated the making of "blatantly false and self-serving statements" was extreme and outrageous. Similarly, in her response, she claimed that by accusing her of theft and embezzlement — based on the known falsity of such statements — the defendants' conduct fell within the category of outrageous and extreme. Thus, as evidence of extreme and outrageous conduct, Dr. Elkins relied solely on the allegedly false statements made by James and Pyles to SAPD and Travelers.

The statements attributed to James and Pyles about Dr. Elkins, as stated in Dr. Elkin's petition, can be summarized as follows:

- Dr. Elkins committed possible theft;

- Dr. Elkins used the practice's petty cash for personal use;

- Dr. Elkins used practice money to pay for family vacations;

- Dr. Elkins committed payroll fraud for a minimum of three years;

- Dr. Elkins breached her confidentiality agreement by making unauthorized copies of documents, stealing financial information, and discussing the practice with outsiders;

- Dr. Elkins attempted to lure other employees away from the practice;

- Dr. Elkins removed practice documents from the office and lied about it;

- Dr. Elkins tampered with and changed the password to a video camera belonging to the practice; and

- Dr. Elkins added her name to Dr. James's personal credit card without permission.

Texas courts have often held that as a matter of law, the making of defamatory statements — even if false — is not the type of conduct that can be considered extreme and outrageous for purposes of an IIED claim. An example that bears a similarity to this case is found in *Diamond Shamrock Ref. & Mkting. Co. v. Mendez*, 844 S.W.2d 198, 202 (Tex. 1992). In *Mendez*, an employee sued his employer for, among other things, IIED after he was terminated. 844 S.W.2d at 198. According to the employee, his supervisor ordered him to clean up debris in his work area; the debris included loose nails discarded by carpenters. *Id.* at 199. The employee was angered by the assignment, considering it outside the scope of his duties. *Id.* at 198–99. While cleaning up, the employee threw some of the nails — the value of which was less than five dollars — into a box and placed the box into his lunch bag. *Id.* at 199. When he left for the day, Mendez left the lunch bag, which contained the nails, near the time clock. *Id.* A security officer found the bag and the nails and reported it to management. *Id.* When confronted by a manager, the employee described what happened. *Id.* A manager asserted it appeared as if the employee was stealing, and the employee was fired. *Id.* Word of the termination quickly spread, and numerous people — including potential employers — knew the employee had been terminated for theft. *Id.* The employee filed suit alleging numerous causes of action, including IIED. *Id.* The employee based his IIED claim not on his termination, but on statements falsely depicting him in the community as a thief. *Id.* at 202.

A jury found in favor of the employee on his IIED claim, but the appellate court found no evidence to support it. *Id.* at 199–200. Upon review by the supreme court, that court agreed, holding that even if the employee's allegation was true — that his employers made statements to

fellow employees and the community at large that depicted him as a thief, such conduct was not sufficiently outrageous to raise a fact issue on the element of extreme and outrageous conduct. *Id.* The supreme court held making false allegations of theft fell short of being "beyond all possible bounds of decency," atrocious," and "utterly intolerable in a civilized community." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d.).

Similarly, in *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, the supreme court held the conduct of an insurance company was not extreme and outrageous when it reported to authorities that one of its agents was involved in misconduct. 84 S.W.3d 604, 611 (Tex. 2002). In *Sears*, an insurance company hired an investigator to look into allegation of an alleged kickback scheme involving one of its agents, Sears. *Id.* at 606. Although the investigation produced no direct evidence that Sears was involved in a kickback scheme, the investigator informed the insurance company that Sears was involved in other suspicious dealings on two particular claims. *Id.* The insurance company terminated Sears and turned the results of the investigation over to the Texas Board of Insurance, the United States Postal Service, the United States Attorney's Office, the Internal Revenue Service, and various other federal agencies. *Id.* In addition, the insurance company attempted to persuade the insurance board to revoke Sears's license and to have the IRS investigate him for tax evasion. *Id.* at 606–07. Thereafter, Sears sued the insurance company and others, alleging numerous causes of action, including IIED. *Id.* at 607. In support of his claim for IIED, Sears relied upon actions the insurance company took after his termination — reporting the results of its investigation to federal and state agencies and attempting to have his insurance license revoked. *Id.* at 612. Sears claimed the investigation was shoddy and the insurance company reported his conduct and sought suspension of his license based on "a personal vendetta designed to punish Sears for making earlier reports of an alleged kickback scheme." *Id.*

The jury found in favor of Sears on his IIED claim, and the court of appeals affirmed this finding, relying on the insurance company's post-termination conduct. *Id.* However, the supreme court held that although motive or intent is relevant to an IIED claim, it is insufficient to support liability. *Id.* Rather, the conduct itself must be extreme and outrageous. *Id.* The supreme court held the insurance company's behavior did not rise to this level, reversing the court of appeals' judgment and rendering judgment that Sears take nothing. *Id.*

Both *Mendez* and *Sears* are instructive. Much like the plaintiffs in those cases, Dr. Elkins relies on statements made by James and Pyles alleging civil and criminal misconduct following an allegedly deficient investigation. Even considering the statements in the light most favorable to Dr. Elkins — that the statements are false, were made with knowledge of their falsity, and based on a faulty investigation, I do not believe they constitute clear and specific evidence of extreme and outrageous conduct for purposes of her IIED claim. *See Spencer*, 2017 WL 993093, at *4 (holding trial court and appellate court are required to consider pleadings and evidence in light most favorable to plaintiff). The statements Dr. Elkins relies on assert theft and other acts of malfeasance with regard to her employment with the practice. These types of statements — as can be seen from *Mendez* and *Sears* — are not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman-LaRoche Inc.*, 144 S.W.3d at 445. I would therefore conclude the evidence relied upon by Dr. Elkins does not constitute clear and specific evidence of extreme and outrageous conduct. Accordingly, I would hold the trial court erred in denying the motions to dismiss Dr. Elkins's claim for IIED as to both James and Pyles.

d. Conspiracy

In her petition, Dr. Elkins alleged James and Pyles intentionally, "in combination with each other, agreed to make false statements to Travelers and to SAPD … by unlawful means … to defraud Travelers, and to cause [her] intentional harm[.]"  Pyles contens the trial court erred in granting her motion to dismiss with regard to the conspiracy allegation because: (1) conspiracy is a derivative claim and because Dr. Elkins failed to prove a prima facie case with regard to any of her underlying tort claims — defamation, business disparagement, and IIED — she likewise failed to establish a prima facie case for her conspiracy claim; (2) Dr. Elkins waived her conspiracy claim by failing to address it in her response to the motions to dismiss; and (3) Dr. Elkins did not establish a prima facie case by clear and specific evidence that James and Pyles had a meeting of the minds to make false statements.[8]

"An action for civil conspiracy has five elements: (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).  To recover for civil conspiracy, a plaintiff must prove "specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means." *Id.*

This court has recognized, that a defendant's liability for civil conspiracy is dependent on his participation in some underlying tort for which a plaintiff seeks to hold at least one of several defendants liable. *Mission Wrecker Serv., S.A., Inc. v. Assured Towing, Inc.*, No. 04-17-00006-CV, 2017 WL 3270358, at *6 (Tex. App.—San Antonio Aug. 2, 2017, pet. denied) (mem. op.)

---

[8] Given that Dr. Elkins failed to establish a prima facie case for any of the underlying torts asserted against James and Pyles, it is irrelevant that James failed to specifically challenge the civil conspiracy allegation in his motion to dismiss.

(citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). Accordingly, we held that under the TCPA, if the plaintiff fails to establish a prima facie case on at least one of the alleged underlying torts for which she sought to hold the defendants liable, she has similarly failed to establish a prima facie case on her civil conspiracy claim. *Id.* Because I believe Dr. Elkins failed to establish a prima facie case for any of the underlying torts asserted against James and Pyles, I would hold she has also failed to establish a prima facie case on her conspiracy claim. *See id.*

With regard to the contention that Dr. Elkins waived her civil conspiracy claim by failing to discuss its elements — or even mention it — in her response to the motions to dismiss, I disagree. In support of this contention, James and Pyles rely on *Bilbrey*. In that case, the court noted that the plaintiff "did not specifically discuss the elements of conspiracy or what evidence supported his conspiracy claim" in his response to the defendant's motion to dismiss. *Bilbrey*, 2015 WL 1120921, at *14. However, the court did not hold the plaintiff had waived his conspiracy claim. *Id.* Rather, the court held that because the plaintiff had failed to make a prima facie case for defamation — the underlying tort relied on for his conspiracy claim — he had likewise failed to make a prima facie case for his conspiracy claim. *Id.* I have found no authority, nor have James or Pyles cited to any authority for the proposition that a plaintiff's failure to address a claim in the response to a motion to dismiss waives that claim. Moreover, such a holding would be contrary to the TCPA. The issue is whether the plaintiff established a prima facie case by clear and specific evidence with regard to each element of her claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 587; *Coleman*, 512 S.W.3d at 899. A plaintiff could possibly meet her burden based on her petition and any evidence attached thereto. Thus, I would decline to hold that failing to address a claim in a response to a motion to dismiss under the TCPA automatically results in waiver of that claim.

Pyles also contends Dr. Elkins's conspiracy claim was subject to dismissal because she failed to provide clear and specific evidence there was a meeting of the minds between James and Pyles to make false statements about Dr. Elkins. As set out above, a conspiracy requires a specific intent to agree to do something unlawful or to do something lawful in an unlawful way. *Parker*, 514 S.W.3d at 222. This requires a meeting of the minds on a course of action. *Id.* Thus, here, Dr. Elkins had to provide clear and specific evidence that Dr. James, Jean, Pyles, or some combination of the three, had agreed to make false statements about Dr. Elkins and report them to SAPD and Travelers.

Viewing Dr. Elkins's contentions in the most favorable light, there is no evidence of an agreement by Dr. James, Jean, Pyles, or any combination thereof, to make false statements about Dr. Elkins. Assuming all of the statements made by James and Pyles about Dr. Elkins were false, there is no evidence of any specific intent to agree to make or report those false statements in an effort to injure Dr. Elkins. In her brief, Dr. Elkins relies on the lack of a complete investigation — failure to review of all the payroll records from 1991 through 2014 — to establish an agreement to assert false statements. At best this evidence shows an agreement to conduct a limited investigation. A limited or deficient investigation is not clear and specific evidence — direct or circumstantial — of an agreement to make and publish false statements. Accordingly, I believe Dr. Elkins failed to provide clear and specific evidence sufficient to establish a prima facie case that there was a meeting of the minds by Dr. James, Jean, Pyles, or any combination of the three, to make and report false statements about her. Thus, for this additional reason, the trial court erred in denying the Pyles's motion to dismiss with regard to the conspiracy claim.

### *Motion for Discovery and Motion for Continuance*

As to Dr. Elkins's contention that the trial court erred in denying her motion for discovery and motion for continuance, she argues that if for any reason this court holds the trial court erred in denying the motions to dismiss, we should further hold the trial court erred in denying her motions for discovery and continuance. She contends the denial of these motions deprived her of access to evidence in possession of James, Pyles, and Travelers that was relevant to the motions to dismiss. *See id.* § 27.006(b) (stating that on motion by party or on court's own motion and on showing of good cause, court may allow specified and limited discovery relevant to motion to dismiss). Because I believe the trial court erred in refusing to grant the motions to dismiss in their entirety, I address Dr. Elkins's contentions with regard to her motions for discovery and for continuance. I would hold Dr. Elkins's complaints regarding the denial of these motions cannot form the basis of an interlocutory appeal.[9]

"A party may not appeal an interlocutory order unless authorized by statute." *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 352 (Tex. 2001). In other words, if there is no statute authorizing an appeal of an interlocutory order, "[a]n appellate court lacks jurisdiction to review" the interlocutory order. *Helix Energy Sols. Group, Inc. v. Howard*, 452 S.W.3d 40, 42 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Qwest Commc'ns Corp. v. AT & T Corp.*, 24 S.W.3d 334, 336 (Tex. 2000)). An interlocutory appeal of a trial court's denial of a motion to dismiss filed under the TCPA is statutorily authorized. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(12); *see also id.* § 27.008. An appellate court's jurisdiction over an interlocutory appeal

---

[9] In my analysis, I assume without deciding that Dr. Elkins was not required to file a separate notice of appeal. *See* TEX. R. APP. P. 25.1(c) (stating that party who seeks to alter trial court's judgment or other appealable order must file notice of appeal); *see also Bell Cnty. v. Kozeny*, No. 10-14-00021-CV, 2014 WL 4792656, at *3 n.3 (Tex. App.—Waco Sept. 24, 2014, no pet.) (mem. op.) (holding that under rule 25.1(c) "and longstanding case law," appellee need not file notice of appeal to assert cross-point to request relief in event of reversal).

is limited to the scope permitted in the statute. *Astoria Indus., of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 626 (Tex. App.—Fort Worth 2007, pet. denied); *see also CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011) (holding appellate courts strictly apply statutes granting interlocutory appeals because they are narrow exceptions to general rule against appeals from interlocutory orders). Issues outside that scope cannot be considered in the interlocutory appeal, even if presented in the same motion or other relief is granted in the same order. *See Astoria Indus.*, 223 S.W.3d at 626.

The authority to seek an interlocutory appeal under the TCPA is limited to appeals from an order *denying a motion to dismiss*. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(12) (emphasis added). Neither section 51.014 of the Civil Practice & Remedies Code nor any other statute permits interlocutory appeals from an order denying discovery under section 27.006(b) of the TCPA or an associated motion for continuance. Accordingly, I conclude this court lacks jurisdiction over Dr. Elkins's issues regarding the trial court's rulings on her motions for discovery and continuance. *See Howard*, 452 S.W.3d 40, 42; *Astoria Indus.*, 223 S.W.3d at 626. When an appeal is from two interlocutory rulings, only one of which is made appealable by statute, the proper course of action is to dismiss the unappealable portion and rule on the portion that is subject to appeal. *Sanders v. City of Grapevine*, 218 S.W.3d 772, 776–77 (Tex. App.—Fort Worth 2007, pet. denied); *Elm Creek Villas Homeowners Ass'n v. Beldon Roofing & Remodeling Co.*, 940 S.W.2d 150, 154 (Tex. App.—San Antonio 1996, no writ). I would dismiss for want of jurisdiction Dr. Elkins's issues relating to the trial court's denial of her motions for discovery and continuance.

## CONCLUSION

Based on my preceding analysis, I would hold: (1) the claims challenged by James and Pyles fall within the TCPA, *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001(3), 27.001(7)(B),

(C); *see also Watson v. Hardman*, 497 S.W.3d 601, 607; (2) Dr. Elkins failed to establish by clear and specific evidence a prima facie case for all of the essential element of her claims, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 460 S.W.3d at 587; *Coleman*, 512 S.W.3d at 899; and (3) Dr. Elkins's issues relating to the trial court's rulings on her motions for discovery and continuance must be dismissed for want of jurisdiction.  I would reverse the trial court's order denying the motions to dismiss filed by James and Pyles in its entirety, render judgment dismissing Dr. Elkin's claims for defamation, business disparagement, IIED, and conspiracy against James and Pyles, and remand this cause to the trial court for a determination of attorneys' fees and costs. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009 (stating that award of attorney's fees and costs is mandatory when action is dismissed under TCPA).  Therefore, I respectfully concur in the portions of the majority opinion and judgment reversing the trial court's order and rendering judgment in favor of James and Pyles, but dissent to the portions of the majority opinion and judgment affirming the trial court's order.

Marialyn Barnard, Justice
